# UNITED STATES DISTRICT COURT

for the

Western District of Washington

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.   MJ20-679 |
| Information associated with One (1) Facebook Account that is stored at Facebook, Inc., more particularly described in Attachment A | ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

Information associated with One (1) Facebook Account that is stored at Facebook, Inc., more particularly described in Attachment A, incorporated herein by reference.

located in the _____ Northern _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841, 846 | Distribution and Possession with Intent to Distribute a Controlled Substance and Conspiracy |

The application is based on these facts:

✓   See Affidavit of Special Agent Alison Wassall, continued on the attached sheet.

☐   Delayed notice of _____ days (give exact ending date if more than 30 days: _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means, or: ☐ telephonically recorded.

_____
*Applicant's signature*

Alison Wassall, Special Agent
*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
◉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date:   _____ 10/22/2020 _____

_____
*Judge's signature*

City and state:  Seattle, Washington

Brian A. Tsuchida, Chief United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT OF ALISON WASSALL

STATE OF WASHINGTON          )
                                                    )          ss
COUNTY OF KING                   )

I, Alison Wassall, a Special Agent with the Drug Enforcement Administration, having been duly sworn, state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am employed as a Special Agent (SA) with the United States Drug Enforcement Administration (DEA), and have been so employed since September 2018. I am currently assigned to the Seattle Field Division.  In this capacity, I investigate violations of the Controlled Substance Act, Title 21, United States Code, Section 801 et seq., and related offenses.  I have received specialized training in the enforcement and investigation of the Controlled Substance Act.  I have received over 620 hours of classroom and practical training which includes, but is not limited to, drug identification, drug interdiction, detection, money laundering techniques and schemes, smuggling, and the investigation of individuals and/or organizations involved in the illegal possession, possession for sale, sales, importation, smuggling, cultivation, manufacturing and illicit trafficking of controlled substances.

2.      In my role as a Special Agent for the Drug Enforcement Administration, I have participated in narcotics investigations (i.e. heroin, cocaine, marijuana, and methamphetamine) that have resulted in the arrest of individuals and the seizure of illicit narcotics and/or narcotic-related evidence.  I have been involved in the service of search warrants as part of these investigations.  As a result of my experience in serving these search warrants, I have encountered and have become familiar with various tools, methods, trends, paraphernalia and related articles utilized by various traffickers in their efforts to import, conceal, and distribute controlled substances.  Through my training and experience, I can identify illegal drugs by sight, odor, and texture.  Additionally, I have

1  written investigative reports, and conducted and participated in interviews of drug
2  traffickers, of various roles within drug organizations, which has provided me with a
3  greater understanding of the methods by which drug trafficking organizations operate.

4          3.      Prior to becoming a Drug Enforcement Administration Special Agent, I
5  was employed by the Washington State Patrol, assigned to the Northwest High Intensity
6  Drug Trafficking Area in Seattle, Washington, as a Criminal Intelligence Analyst for
7  approximately three years.  I received specialized training from the Drug Enforcement
8  Administration Basic Intelligence Research Specialist academy and received over 350
9  hours of classroom training.  During my time as an analyst, I supported numerous state
10 and federal drug trafficking cases, assisted with the execution of both state and federal
11 search warrants, and was a participant with the Washington State Patrol Marijuana
12 Eradication Team.  As a result of my experience in participating in search warrants as an
13 analyst, I have encountered and have become familiar with various tools, methods,
14 trends, paraphernalia, and related articles utilized by various traffickers in their efforts to
15 import, conceal, and distribute controlled substances.  I am also familiar with the various
16 methods of packaging, delivering, and transferring of narcotics.

## PURPOSE OF AFFIDAVIT

17         4.      This affidavit is made in support of an application for a search warrant for
18 information associated with the following Facebook URL:

19         a.      https://www.facebook.com/jasielalonso.castrourias.1?tsid=0.404760
20 45206364564&source=result (hereinafter, the "**Target Facebook Account**"), that is
21 stored at a premises owned, maintained, controlled, or operated by Facebook, a social
22 networking company headquartered in Menlo Park, California.

23         5.      The information to be searched and seized is described in the following
24 paragraphs and in Attachment A, attached hereto and incorporated herein.  This affidavit
25 is made in support of an application for a search warrant under Title 18, United States
26 Code, Sections 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose
27 to the government records and other information in its possession, more thoroughly

AFFIDAVIT OF SA WASSALL - 2
USAO#2019R00980 (FACEBOOK)

described in Attachment B, attached hereto and incorporated herein, pertaining to the subscriber or customer associated with the Facebook account.  As set forth below, there is probable cause to believe that the information sought would provide evidence of violations of Title 21, United States Code, Sections 841 and 846, as well as contraband or fruits of crime, property designed or intended for use in crime, and the location of a person to be arrested.

6.   Because this affidavit is being submitted for the limited purpose of obtaining a search warrant for the Facebook account referenced above, I have not included every fact known to me concerning this investigation.  Rather, I have set forth only the facts that I believe are necessary for a fair determination of probable cause and to show that there is probable cause to issue the requested warrant.

7.   This affidavit describes intercepted Spanish-language communications. DEA linguists have translated those communications into English.  Except where otherwise indicated, the quotations of communications below are the English translations of the original Spanish communications.

## SOURCES OF INFORMATION

8.   I have obtained the facts set forth in this affidavit through my personal participation in the investigation described below; from oral and written reports of other law enforcement officers; and from records, documents and other evidence obtained during this investigation.  I have obtained and read official reports prepared by law enforcement officers participating in this investigation and in other investigations by the DEA.  When I refer to registration records for vehicles, I am relying on records obtained from the Washington State Department of Licensing (WA DOL).  Insofar as I have included event times in this affidavit, those event times are approximate.

## SUMMARY OF PROBABLE CAUSE

The T-III Wiretap Investigation into Delmer Velasquez-Licona

9.   The United States, including the DEA, is conducting a criminal

AFFIDAVIT OF SA WASSALL - 3
USAO#2019R00980 (FACEBOOK)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

investigation of a drug trafficking organization (DTO) operating in the Western District of Washington which distributes narcotics, including heroin, methamphetamine, cocaine, and fentanyl.  Investigators believe Delmer Velasquez-Licona is a redistributor for the DTO, Rodrigo Alvarez-Quinonez and Jasiel Alonso Castro-Urias are sources of supply for the DTO, and Cesar Rojo-Gomez, Jorge Cruz-Hernandez and Jose Fernando Escoto-Fiallos are narcotics associates of members of the DTO, as described herein.

10.      Since late November 2019, investigators have received multiple court authorizations in the Western District of Washington to intercept wire and electronic communications to and from phones utilized by members of the DTO.  As it pertains to this application, these include:

11.      On December 6, 2019, the Honorable U.S. District Court Judge Ricardo S. Martinez signed an order authorizing the interception of the wire and electronic communications over 206-231-8342/TT18.[1]  Interception of TT18 began on or about December 6, 2019.  TT18 was utilized by Velasquez-Licona, a redistributor for the DTO. Wire and electronic interceptions of TT18 ended on January 4, 2020.

12.      On January 9, 2020, the Honorable U.S. District Court Judge James L. Robart signed an order authorizing the continued interception of the wire and electronic communications to and from 206-531-9979/TT18, and authorizing the initial interception of the wire and electronic communications to and from 425-496-3287/TT19 (utilized by Rodrigo Alvarez-Quinonez, a source of supply for the DTO) and 206-929-8743/TT23 (utilized by Gustavo Sandoval-Agurcia, a redistributor for the DTO).  Interception of the three phones terminated on February 7, 2020.

13.      On July 29, 2020, the Grand Jury returned two indictments charging a total of 15 defendants with drug-trafficking crimes, including Velasquez-Licona, Alvarez-

---

[1] TT18 was originally assigned phone number 206-231-8342, however, according to T-Mobile, the phone number was changed on December 20, 2019, to 206-531-9979.  The IMSI remained the same for the phone and T-Mobile continued to honor the T-III order until its expiration.  The user of the phone remained Delmer Velasquez-Licona.

AFFIDAVIT OF SA WASSALL - 4
USAO#2019R00980 (FACEBOOK)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Quinonez, Cruz-Hernandez, Escoto-Fiallos, and Saul-Suarez, referenced in this Affidavit.

2  Those defendants were arrested on those charges on August 5, 2020.

3  December 12, 2019 – Suspected Intercepted Narcotics Transaction in Seattle,
   Washington

4
5  14.    On December 12, 2019, at approximately 2:40 p.m. (session #873), 206-

   231-8342 (TT18/utilized by Delmer Velasquez-Licona) received an incoming phone
6
   call from 206-429-0722 (TT20/utilized by Saul Suarez).  During the call, Suarez asked
7
   Velasquez-Licona, "if I get twenty of those animals how much would you give them to
8
   me for?"  Velasquez-Licona stated, "let me call the guy right now to find out."
9
10 15.    On the same date, at approximately 2:41 p.m. (session #874), TT18 placed

11 an outgoing call to 425-496-3287 (TT19/Rodrigo Alvarez-Quinonez).  No one answered

12 the call.  At approximately 2:42 p.m. (session #876), TT18 sent an outgoing text message

13 to TT19 which stated, "Sir, what's up?  Please, call me when you can."  At approximately

14 the same time (session #877), TT18 received an incoming text message indicating that

   TT19 was unable to receive incoming text messages.
15
16 16.    At approximately 2:44 p.m. (session #880), TT18 sent an outgoing text

17 message to TT20/Suarez which stated, "the man [likely Alvarez-Quinonez] is not

18 answering me, but I left him a message, I hope he answers me.  I will let you know

19 soon."  At approximately 2:46 p.m. (session #883), TT20/Suarez responded to TT18, via

   text message, "put pressure on him if the "work" is good, and that way a twenty can be
20
   gone every two days."
21
22 17.    From approximately 2:59 p.m. to approximately 3:22 p.m. (sessions #884

23 through 887), TT18 attempted to call TT19/Alvarez-Quinonez four times with no

   response.
24
25 18.    At approximately 4:15 p.m. (session #898), TT18 received an incoming

26 phone call from 720-676-3911 (used by a suspected narcotics redistributor known only as

27 "Luis," believed to be Cesar Rojo-Gomez).  During the call, Velasquez-Licona stated, "I

28 don't know what's up, the guy asked me that, that, how much will you give them to him

AFFIDAVIT OF SA WASSALL - 5
USAO#2019R00980 (FACEBOOK)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

for each one of them? Because the guy wants twenty." The user of 720-676-3911 then stated, "I can tell to, to Cesarin [believed to be Castro-Urias[2]] to give you one of twenty." Velasquez-Licona replied, "let me see if I can do this guy [likely Suarez] a favor since he called me asking me."

19.     At approximately 5:29 p.m. (session #899), TT18 received an incoming text message from TT20/Suarez which asked, "how is that situation going?" TT18 responded at approximately 5:54 p.m. (session #902), "that dude [likely Alvarez-Quinonez] is not answering me, the phone seems turned off, but those guys from Mexico have two churros."[3]

20.     At approximately 6:03 p.m. (session #913), TT18 again tried to call TT19/Alvarez-Quinonez. No one answered the call.

21.     At approximately 6:04 p.m., TT18 (206-231-8342, utilized by Velasquez-Licona at the time) placed an outgoing call to 720-676-3911, believed to be Rojo-Gomez. During the call, Velasquez-Licona stated to Rojo-Gomez that he had talked to a "guy" (likely Suarez) who had "five bucks" and Velasquez-Licona wanted to know what Rojo-Gomez thought. Rojo-Gomez told Velasquez-Licona to call "Cesar" (believed to be Castro-Urias) and tell him about it. Rojo-Gomez continued and stated Rojo-Gomez already talked to "Cesar" and "Cesar" stated if "he" (likely Suarez) had the "five bucks," Velasquez-Licona could take "two" and Velasquez-Licona could get the other "one" out. Velasquez-Licona replied that he lost "Cesar's" phone but Velasquez-Licona would call him (likely Castro-Urias) via Facebook now. Rojo-Gomez asked if "Calamardo's" (likely referring to the **Target Facebook Account**); Velasquez-Licona replied yes and he would send him (likely Castro-Urias) a message on Facebook (believed to be the **Target**

---

[2] Throughout this investigation, investigators identified multiple nicknames for Castro-Urias, to include: "Cesar," "Cesarin," "Calamardo," and "Kalamardo." For simplicity in this affidavit, I will refer to "Cesar"/"Cesarin"/"Calamardo"/"Kalamardo" as Castro-Urias, which is further explained and detailed in the following sections.

[3] During a separate, unrelated, outgoing phone call with 206-742-2993 (session #856), TT18/Velasquez-Licona was intercepted stating that a "churro" contained approximately 20 ounces of heroin.

AFFIDAVIT OF SA WASSALL - 6
USAO#2019R00980 (FACEBOOK)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  **Facebook Account**) now tell him to send Velasquez-Licona his (likely Castro-Urias's)

2  number. Rojo-Gomez acknowledged.

3       22.    Based on the aforementioned call, I believe[4] Velasquez-Licona called Rojo-

4  Gomez to arrange a future narcotics transaction likely involving Suarez.  Based on my

5  training and experience,[5] I believe that when Velasquez-Licona stated Suarez had "five

6  bucks," he was referring to five thousand dollars for an unspecified type and amount of

7  narcotics. Furthermore, I believe that Rojo-Gomez is a narcotics associate of Castro-

8  Urias, who Velasquez-Licona is attempting to contact regarding the anticipated narcotics

9  transaction. Additionally, I believe that Velasquez-Licona told Rojo-Gomez that he

10  would reach out to Castro-Urias through the **Target Facebook Account** to discuss the

11  suspected narcotics transaction.

12  January 15, 2020: Consent to search of Red Kia Rio in Seattle, Washington

13       23.    On January 15, 2020, at approximately 1:09 p.m., TT18 (206-531-9979,

14  utilized by Velasquez-Licona at the time) received an incoming call from 52-668-103-

15  8205 (utilized by "Cesar"/"Calamardo," believed to be Jasiel Alonso Castro-Urias,

16  further explained below).[6]  During the call (session #3490), Castro-Urias stated, "We

17  brought....and we brought it before December the 24th, before Christmas we brought it

18  up, and the guy that brought it had to go back that same time, and he was the same guy

19  that had the other stuff."  Castro-Urias then continued, "And that guy went here to

20  Mexico, and he was caught in Nogales and there he is tied up.....and who knows if when

21  they will release him.  I am trying to find the location of the house where he was living,

22  or apartment.  I am looking for the location because at that place there are a whole two

23

24

25  _____

26  [4] For simplicity in this affidavit, when I refer to my beliefs, I am also referring to the beliefs of investigators more senior than I whom I have consulted with throughout this investigation.

27  [5] For simplicity in this affidavit, when I refer to my training and experience, I am also referring to the training and experience of investigators more senior than I whom I have consulted with throughout this investigation.

28  [6] In previous affidavits, the user of 52-668-103-8205 was only known as "Cesar"/"Calamardo."

AFFIDAVIT OF SA WASSALL - 7
USAO#2019R00980 (FACEBOOK)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  and a half and 5,000 pills." Velasquez-Licona responded, "Yes, man, and I can help you

2  take that out, if you would want. You are the person who is in charge."

3        24.    During the same call, Castro-Urias inquired, "If I find you the location

4  would you go there? Everything was paid, there is no problem; the rent and

5  everything." Velasquez-Licona responded, "I understand now. Is there any people

6  there?" Castro-Urias responded, "No, no there's no one there. The dude came over here

7  but he's tied up, they have him tied up here. I don't know if he's still alive." Velasquez-

8  Licona stated, "Oh that's fucked up. So how do we get there?" Castro-Urias responded,

9  "Well, that's what I am trying to figure out. I keep calling the dude, but he doesn't call

10 me back." Castro-Urias then continued, "If I get, if I get the location and the apartment

11 number, can you head there?" Velasquez-Licona responded, "Yeah, we'll head out there

12 to see what's up." Castro-Urias then stated, "For sure, it's near Seattle, fifteen minutes,

13 apparently."

14       25.    At approximately 3:09 p.m., TT18 received an incoming call from 52-668-

15 103-8205. During the call (session #3502), Castro-Urias stated, "Right now they are

16 going to send to me; right now, they are going to send me the exact location from

17 there." Castro-Urias continued, "When the lady gives me the address, I, I, am going to

18 send it to you via WhatsApp."

19       26.    At approximately 3:24 p.m., TT18 sent a text message to 206-476-3701

20 (TT21/utilized by Jose Fernando Escoto-Fiallos). The text message (session

21 #3507) inquired, "Dude, do you have a locksmith?" Moments later, TT18 called

22 TT21. During the call (session #3509), Velasquez-Licona asked Escoto-Fiallos, "Dude,

23 do you know who can open doors?" Velasquez-Licona continued, "Look those guys

24 have an apartment full of work, and the guy who was staying at the apartment the mafia

25 got him." Escoto-Fiallos stated, "Let me text him [likely the locksmith] right now then."

26 Escoto-Fiallos continued, "Let me get ahold of him, and I'll wait to get back to you

27 shortly."

28

AFFIDAVIT OF SA WASSALL - 8
USAO#2019R00980 (FACEBOOK)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

27.     At approximately 3:43 p.m., TT18 called TT21.  During the call (session #3515), Velasquez-Licona asked, "Is it possible?"  Escoto-Fiallos responded, "Yes."  Velasquez-Licona then asked, "But he has all the right tools, so he can't make too much noise?"  Escoto-Fiallos told Velasquez-Licona, "Don't worry for that because if that's his bread and butter is because he has everything."  Velasquez-Licona continued, "We are going to go there by later tonight.  I don't know if you go in that car because there are three kilos in there."  Velasquez-Licona later stated, "If there isn't anything, well, we'll be unlucky, but anyway, at least some pieces of "white" or "dark" we'll get it."  Velasquez-Licona continued that, "This guy [the prior occupant of the apartment] was killed.  The mafia got him going back to Mexico."  Velasquez-Licona then stated, "Another mafia, you know.  They took the money and they killed him."  Velasquez-Licona continued, "These guys, they, they, don't want to lose that work."  Escoto-Fiallos then asked, "So what time should it be then?  Because it can't be so, so dark because otherwise, it would look so clear."  Velasquez-Licona then stated, "Make sure it is not too loud with those things this guy [locksmith] is going to bring."  Velasquez-Licona then stated, "The guy is going to let me know as soon as he gets the address."

28.     I believe that based on my training and experience, these intercepts are clear that Velasquez-Licona was requesting assistance from Escoto-Fiallos to break into a vacant apartment (at the request of individuals based in Mexico) to retrieve narcotics due to the prior occupant possibly being killed by individuals possibly linked to cartels in Mexico.

29.     At approximately 3:55 p.m., surveillance was established in the area of Velasquez-Licona's residence: 14039 Greenwood Avenue North, Seattle, Washington, and near Escoto-Fiallos' suspected residence: 11338 3rd Avenue NE, Seattle, Washington.

30.     At approximately 4:34 p.m., TT18 called TT21.  During the call (session #3520), Velasquez-Licona told Escoto-Fiallos, "Come pick me up whenever you want, but bring a hammer and a screwdriver."  Velasquez-Licona continued, "Apparently the

AFFIDAVIT OF SA WASSALL - 9
USAO#2019R00980 (FACEBOOK)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    apartment door is open." Velasquez-Licona continued that, "there are seven balls, there

2    are seven packages there." Escoto-Fiallos stated, "Good." Velasquez-Licona then again

3    told Escoto-Fiallos, "Find a, um, a hammer, then."

4        31.    At approximately 4:37 p.m., TT18 called TT21. During the call (session

5    #3521), Velasquez-Licona stated that, "It is at Rainier's." Escoto-Fiallos stated, "Okay

6    then I am almost there."

7        32.    At approximately 4:50 p.m., an investigator observed a green Nissan pick-

8    up truck at 11338 3rd Avenue NE, Seattle, Washington, Escoto-Fiallos' suspected

9    address at the time. The license plate on the pick-up truck was later confirmed, via

10   remote electronic surveillance, to be WA/C37238P (TV2). Surveillance was maintained

11   on TV2. At approximately 5:07 p.m., an investigator observed TV2 depart the residence.

12       33.    At approximately 5:11 p.m., TT21 sent a text message to TT18. The

13   message (session #3524) stated, "Let's go." At approximately 5:16 p.m., TT18 sent a

14   text message to TT21. The message (session #3530) stated, "I'll be right out. I am

15   showering." At approximately 5:18 p.m., I observed the Nissan pick-up (TV2) at

16   Velasquez-Licona's residence, via remote electronic surveillance.

17       34.    At approximately 5:35 p.m., TT18 sent a text message to TT21. The

18   message (session #3536) stated, "Jorge is going to go help search but do not tell him

19   about the money. We are going to keep it." Based on the later events from this

20   surveillance, I believe that "Jorge" was referring to Jorge Cruz-Hernandez, a narcotics

21   associate of Velasquez-Licona, and user of TT22.

22       35.    At approximately 5:46 p.m., I observed, via remote electronic surveillance,

23   three males, believed to be Velasquez-Licona, Cruz-Hernandez, and Escoto-Fiallos enter

24   into a red Kia Rio (WA/AUW0996/TV1) and depart the area. Surveillance was

25   maintained on the Kia. Tracking data for phones associated with all three individuals

26   (TT18/Velasquez-Licona, TT21/Escoto-Fiallos, and TT22/ Cruz-Hernandez) indicated all

27   three phones "travelled" with the Kia upon it departing Velasquez-Licona's residence.

28

AFFIDAVIT OF SA WASSALL - 10
USAO#2019R00980 (FACEBOOK)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

36.     At approximately 6:30 p.m., the Kia arrived in the area of Rainier Avenue South, just to the north of South Thistle Street, Seattle, Washington.  An investigator observed all three males exit the Kia and access the trunk of the vehicle.  At approximately 6:33 p.m., an investigator observed two of the males head towards a building to the southeast of the car, before the third male joined them.  Another investigator confirmed the address the males accessed was 8416 Rainier Avenue South, Seattle, Washington.

37.     At approximately 6:59 p.m., TT18 received an incoming call from 719-644-4597 (utilized by Cesar Rojo-Gomez).  Rojo-Gomez is believed to be an associate of Castro-Urias based on the context of this call.  During the call (session #3541), Rojo-Gomez asked, "How did it go?"  Velasquez-Licona responded, "I am here inside, man, looking and looking and there is nothing."  Rojo-Gomez then stated, "Check for me there, check for me there, right in there, inside that wall where they told you, there are some there."  Velasquez-Licona responded, "Oh, yes, in that wall where they told me, I already extracted three balls of ten each, I think that's what they are, but...Calamardo (likely Castro-Urias) says that there is more, but for now he told me to get out of here, that he was going to call the lady so he can be sure about that, because he told me there were 5,000 of the blue ones and no, no, I could not find anything." Velasquez-Licona later stated, "I am going to video call you so he can see it." Rojo-Gomez then stated, "Alright, so I can see what the deal is there, so I can tell you where...I know where they all were there."

38.     Based on my training and experience, this exchange was Rojo-Gomez directing Velasquez-Licona (who was in the apartment) on where to search for the suspected narcotics and money that Rojo-Gomez was told were inside the apartment.

39.     At approximately 7:10 p.m., an investigator observed a male exiting the area of the aforementioned address carrying a black gym bag.  The investigator then observed the individual enter the Kia.  At approximately 7:24 p.m., the investigator observed another male exit the area of the aforementioned address carrying a space heater

AFFIDAVIT OF SA WASSALL - 11
USAO#2019R00980 (FACEBOOK)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   and multiple bags.  The investigator then observed the male enter the driver's seat of the

2   Kia.  At approximately 7:25 p.m., the investigator observed a third male exit the area of

3   the aforementioned address carrying a television.

4        40.    At approximately 7:29 p.m., Seattle Police Department (SPD) North Anti-

5   Crime Team (ACT) initiated an investigative stop of the red Kia.  Spanish speaking

6   SPD Officers were also present to assist with translation.  A SPD Officer spoke with all

7   three subjects.  The first male (who was detained and in handcuffs) stated that his name

8   was Jorge Cruz-Hernandez, however he did not have any Washington State

9   identification.  Cruz-Hernandez stated his friend had asked him to help him move some

10  stuff from his apartment.  The SPD Officer then asked Cruz-Hernandez for consent

11  to search his vehicle.  Cruz-Hernandez agreed to allow his vehicle to be searched and was

12  then advised of his Miranda rights by the SPD Officer.

13       41.    A search of the vehicle was then conducted by SPD Officers.

14  Approximately 3.6 pounds of heroin were located inside a duffel bag, which was located

15  on the front passenger seat floorboard (field tested positive for heroin).  Cruz-Hernandez

16  and Escoto-Fiallos denied the heroin was theirs.  Velasquez-Licona then stated he did not

17  know what was inside the packages and that he was coerced into picking up the

18  heroin.  Velasquez-Licona continued that the original owner of the apartment was killed

19  in Mexico.  All three individuals were released pending further investigation.

20  DEA Phoenix Investigation: February 2020 Traffic Stop

21       42.    During February 2020, DEA Phoenix conducted a traffic stop of a silver

22  2012 Chevrolet Malibu, bearing Arizona license plate CSV0192, in Phoenix, Arizona.

23  Subsequent to a narcotics canine alert, investigators located approximately 183 grams of

24  cocaine, approximately 123 grams of methamphetamine, approximately 317 grams of

25  heroin, approximately 317 blue M30 fentanyl pills, and approximately $2,362.00 of U.S.

26  currency.  On the same date, as a result of the traffic stop, investigators obtained a search

27  warrant for the residence at 2410 West Campbell Avenue, Apartment 137, in Phoenix,

28  Arizona.

AFFIDAVIT OF SA WASSALL - 12
USAO#2019R00980 (FACEBOOK)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

43.     Prior to the execution of the search warrant, DEA Phoenix conducted surveillance at the aforementioned apartment.  At approximately 1:01 p.m., investigators observed a Hispanic female (HF) attempt to enter Apartment 137. Investigators detained the HF who spoke with investigators outside and nearby the apartment.  The HF initially advised the investigators that she was looking for her friend's apartment to pick up a shirt from work.  The HF then admitted she wanted to be truthful because she had her son in the car.  The HF stated her boyfriend, "Jasiel," who lives in Mexico, messaged her asked her to swing by the apartment because one of his workers got stopped by the police.  The HF initially stated she wanted to make sure everything was ok at the apartment.  The HF stated she had arranged to rent the apartment for her boyfriend through her landlord and did not want to jeopardize where she was staying now.  The HF also stated she thought the apartment was empty.  After a consent search of the HF's phone, an investigator observed WhatsApp voice messages with Jasiel in which Jasiel asked the HF to remove money from the apartment.  An investigator observed the phone number for Jasiel to be 52-667-498-9675.  An investigator confronted the HF with this information and the HF stated she didn't want to get involved.  The HF did provide a Facebook profile for Jasiel Alonso Castro-Urias at "https://www.facebook.com/jasielalonso.castourias.1.," the **Target Facebook Account**.

44.     During the execution of the search warrant at the apartment, investigators located approximately 861 grams of fentanyl powder, approximately 3,800 blue M30 fentanyl pills, approximately 44 grams of heroin, approximately $32,819 of U.S. currency, and a Ruger LC9 9mm handgun.

45.     Investigators had previously intercepted multiple calls between TT18 (Velasquez-Licona), and 52-667-498-9675, the phone number for "Jasiel" in the HF's phone.  Pursuant to the above information, investigators requested a voice comparison between 52-668-103-8205 (the number on which "Cesar" or "Calamardo" called Velasquez-Licona on January 15, 2020, described above) and 52-667-498-9675.  DEA-

AFFIDAVIT OF SA WASSALL - 13
USAO#2019R00980 (FACEBOOK)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    contracted linguists concluded the user of 52-668-103-8205 and 52-667-498-9675 to be

2    the same person, and investigators believe the user to be Castro-Urias.

3    Information Regarding the Target Facebook Account

4         46.    Based upon the previous seizure in Arizona, investigators were able to

5    locate the **Target Facebook Account** for Castro-Urias.

6         47.    While I cite the above examples as it likely relates to Castro-Urias

7    facilitating narcotics-related activities through the **Target Facebook Account**, Castro-

8    Urias appears to be careful about posting any illegal activity on his publicly available

9    Facebook page**.**  During this investigation**,** investigators learned of the **Target Facebook**

10   **Account**, and have reviewed the publicly available content of the **Target Facebook**

11   **Account.**  Multiple photos of Castro-Urias are available on the page, however, no

12   criminal or asset information has been displayed.  As noted, photos are displayed for

13   public viewing, and have been "posted" during the investigation, spaced out by several

14   months.  Recently, on August 21, 2020, two photos were "posted" for public viewing; in

15   comparison, the previous photo was "posted" on December 13, 2019.  Based on these

16   recently posted two photos, I believe the Facebook page is still utilized by Castro-Urias.

17        48.    Based on my training and experience, traffickers will utilize Facebook and

18   its messaging service "Facebook Messenger" to communicate with each other and to

19   facilitate their narcotics trafficking activities.  At times, even when investigators are

20   intercepting phone conversations with targets, investigators will not get all of the

21   communications of the target due to the target's use of email and third party

22   applications, such as "WhatsApp" and/or Facebook.

23        49.    In addition, Castro-Urias is believed to be in Mexico.  Facebook retains

24   Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain

25   information about the actions taken by the user ID or IP address on Facebook, including

26   information about the type of action, the date and time of the action, and the user ID and

27   IP address associated with the action.  For example, if a user views a Facebook profile,

28   that user's IP log would reflect the fact that the user viewed the profile, and would show

AFFIDAVIT OF SA WASSALL - 14
USAO#2019R00980 (FACEBOOK)

when and from what IP address the user did so.  By following up on the IP address information, an investigator may be able to determine the physical location that the Facebook user was at when he or she accessed Facebook via the Internet.  This information will be particularly useful for potential future extradition operations.

## BACKGROUND RELATED TO FACEBOOK SOCIAL NETWORKING SERVICES

50.     Facebook owns and operates a free access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

51.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

52.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

53.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting

AFFIDAVIT OF SA WASSALL - 15
USAO#2019R00980 (FACEBOOK)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

54.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

55.     Facebook has a Photos application, where users can upload an unlimited number of albums and photos.  For Facebook's purposes, a user's "Photoprint" includes all photos uploaded by that user that have not been deleted and other items.

56.     Facebook users can exchange private messages on Facebook with other users.  These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a "Chat" feature that allows users to send and receive instant messages through Facebook.  These chat communications are stored in the chat history for the account.  Facebook also has a Video

AFFIDAVIT OF SA WASSALL - 16
USAO#2019R00980 (FACEBOOK)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 | Calling feature, and although Facebook does not record the calls themselves, it does keep
2 | records of the date of each call.

3 |     57.    If a Facebook user does not want to interact with another user on Facebook,
4 | the first user can "block" the second user from seeing his or her account.

5 |     58.    Facebook has a "like" feature that allows users to give positive feedback or
6 | connect to particular pages.  Facebook users can "like" Facebook posts or updates, as
7 | well as webpages or content on third party (i.e., non Facebook) websites.  Facebook users
8 | can also become "fans" of particular Facebook pages.

9 |     59.    Facebook has a search function that enables its users to search Facebook for
10 | keywords, usernames, or pages, among other things.

11 |     60.    Each Facebook account has an activity log, which is a list of the user's
12 | posts and other Facebook activities from the inception of the account to the present.  The
13 | activity log includes stories and photos that the user has been tagged in, as well as
14 | connections made through the account, such as "liking" a Facebook page or adding
15 | someone as a friend.  The activity log is visible to the user but cannot be viewed by
16 | people who visit the user's Facebook page.

17 |     61.    Facebook Notes is a blogging feature available to Facebook users, and it
18 | enables users to write and post notes or personal web logs ("blogs"), or to import their
19 | blogs from other services, such as Xanga, LiveJournal, and Blogger.

20 |     62.    The Facebook Gifts feature allows users to send virtual "gifts" to their
21 | friends that appear as icons on the recipient's profile page.  Gifts cost money to purchase,
22 | and a personalized message can be attached to each gift.  Facebook users can also send
23 | each other "pokes," which are free and simply result in a notification to the recipient that
24 | he or she has been "poked" by the sender.

25 |     63.    Facebook also has a Marketplace feature, which allows users to post free
26 | classified ads.  Users can post items for sale, housing, jobs, and other items on the
27 | Marketplace.

28 |

AFFIDAVIT OF SA WASSALL - 17
USAO#2019R00980 (FACEBOOK)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

64.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

65.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile.  The "Neoprint" for a given user can include the following information from the user's profile:  profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

66.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

67.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

68.     On July 30, 2020, I submitted a preservation request for the **Target Facebook Account** through Facebook.com.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**REQUEST FOR NON-DISCLOSURE AND SEALING**

69.     The government requests, pursuant to the preclusion of notice provisions of Title 18, United States Code, Section 2705(b), that Facebook be ordered not to notify any person (including the subscriber or customer to which the materials relate) of the existence of this warrant for such period as the Court deems appropriate.  The government submits that such an order is justified because notification of the existence of this Order would seriously jeopardize the ongoing investigation.  Such a disclosure would give the subscriber an opportunity to destroy evidence, change patterns of behavior, notify confederates, or flee or continue his flight from prosecution.

70.     It is further respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  This is an ongoing investigation, and the targets do not know the details of what investigators have learned and what evidence has been gathered.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness by resulting in the flight of targets, the destruction of evidence, or the intimidation or influencing of witnesses.

**CONCLUSION**

71.     Based on the forgoing, I request that the Court issue the proposed search warrant.  This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Pursuant to 18 U.S.C. § 2703(g), the presence of a law

//

//

///

AFFIDAVIT OF SA WASSALL - 19
USAO#2019R00980 (FACEBOOK)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

enforcement officer is not required for the service or execution of this warrant.

ALISON WASSALL, Affiant
Special Agent, DEA

The above-named agent provided a sworn statement to the truth of the foregoing affidavit by telephone on this 22nd day of October, 2020

BRIAN A. TSUCHIDA
Chief United States Magistrate Judge

AFFIDAVIT OF SA WASSALL - 20
USAO#2019R00980 (FACEBOOK)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ATTACHMENT A**

**Property to Be Searched**

 1. This warrant applies to information associated with the following Facebook user URL:

https://www.facebook.com/jasielalonso.castrourias.1?tsid=0.40476045206364564&source=result; that is stored at a premises owned, maintained, controlled, or operated by Facebook, a social networking company headquartered in Menlo Park, California.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT B**

**Particular Things to be Seized**

I.   Information to be disclosed by Facebook

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)   All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)   All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)   All Photoprints;

(d)   All Neoprints, including profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)   All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending Friend requests;

(f)   All check-ins and other location information;

ATTACHMENT B- 1
USAO#2019R00980 (FACEBOOK)

1   (g)  All IP logs, including all records of the IP addresses that logged into the

2 account;

3   (h)  All records of the account's usage of the "like" feature, including all

4 Facebook posts and all non-Facebook webpages and content that the user has liked;

5   (i)  All information about the Facebook pages that the account is or was a "fan"

6 of;

7   (j)  All past and present lists of friends created by the account;

8   (k)  All records of Facebook searches performed by the account;

9   (l)  All information about the user's access and use of Facebook Marketplace;

10   (m)  The length of service (including start date), the types of service utilized by

11 the user, and the means and source of any payments associated with the service

12 (including any credit card or bank account number);

13   (n)  All privacy settings and other account settings, including privacy settings

14 for individual Facebook posts and activities, and all records showing which Facebook

15 users have been blocked by the account; and

16   (o)  All records pertaining to communications between Facebook and any

17 person regarding the user or the user's Facebook account, including contacts with support

18 services and records of actions taken.

19 II.  <u>Information to be seized by the government</u>

20   All information described above in Section I that constitutes evidence, fruits or

21 instrumentalities of the crimes of Distribution of controlled substances, and conspiracy**,**

22 in violation of 21 U.S.C. §§ 841(a)(1) and 846; (with respect to Jasiel Alonso CASTRO-

23 Urias):

24   (a)  any and all Wall Posts, private messages, status updates, chat history, friend

25 requests, postings, photographs, or any other information, records, or other material or

26 information that relates to drug trafficking, or activity related to or in furtherance of drug

27 trafficking;

28

ATTACHMENT B- 2
USAO#2019R00980 (FACEBOOK)

1     (b)    any and all IP logs, including all records of the IP addresses that logged

2 into the account, and the dates and times such logins occurred, as well as any other

3 connection information;

4     (c)    records relating to who created, used, or communicated with the user ID,

5 including records about their identities and whereabouts;

6     (d)    financial records and information, including but not limited to money

7 transfers or wires to Mexico;

8     (f)    information identifying the names, location, or other contact information of

9 people in contact with suspected drug traffickers;

10     (g)    any information, records, or other material relevant to firearm possession of

11 trafficking by Jasiel Alonso CASTRO-Urias; and

12     (h)    any information, records, or other material relevant to the whereabouts of

13 Jasiel Alonso CASTRO-Urias.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ATTACHMENT B- 3
USAO#2019R00980 (FACEBOOK)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970